MARK I MARKETING CORPORATION and Mark I Marketing Corporation of America, Plaintiffs–Appellants,

v.

R.R. DONNELLEY & SONS COMPANY, Defendant–Appellee.

No. 95–1101.

United States Court of Appeals, Federal Circuit.

Sept. 14, 1995.

Eliot S. Gerber, Wyatt, Gerber, Burke & Badie, New York City, argued for plaintiff-appellant. Of counsel was Terence W. McMillin, Gerstmen, Ellis & McMillin, Ltd., Chicago, IL.

Thomas F. Ryan, Sidley & Austin, Chicago, IL, argued for defendant-appellee. With him on the brief were Constantine L. Trela and John W. Treece. Also on the brief was Richard S. Phillips, Wood, Phillips, VanSanten, Clark & Mortimer, Chicago, IL.

Before NIES, MAYER, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Mark I Marketing Corporation and Mark I Marketing Corporation of America (collectively "Mark I") appeal from the order of the United States District Court for the Northern District of Illinois granting summary judgment of noninfringement in favor of R.R. Donnelley & Sons Company ("Donnelley"). *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, No. 92 C 8380, 1994 WL 603884 (N.D.Ill. Nov. 1, 1994). Because prosecution history estoppel precludes Mark I from asserting infringement under the doctrine of equivalents, we affirm.

## BACKGROUND

Color images in magazines, books, and newspapers are conventionally formed by a process that uses four printing plates and the four "process" inks (cyan, magenta, yellow, and black). In this process, four films or "separations" are first made by scanning an original color image with an electronic scanner or by photographing the image through different colored filters.[1] Once the separations are prepared, they are used to make four printing plates, each one corresponding to a process ink color. When used in combination, the printing plates generate a four-color image which, to the naked eye, appears to encompass the entire spectrum of colors and shades.

For certain printing applications, such as the printing of telephone directories, newspapers, and advertising flyers, the conventional four-color separation process is prohibitively expensive due to the need to prepare and use four printing plates. The invention disclosed and claimed in U.S. Patent 4,554,241[2] ad-dresses this problem by providing a process for printing color images on paper using only two printing plates and two "non-process" inks. Wallace Edwards is the inventor of this process and the chairman and chief executive officer of Mark I. Edwards assigned his rights in the invention to Mark I.[3]

The '241 patent discloses a process in which each of two printing plates is created by sequentially making two different filter exposures of an original color image on a separation film. The first printing plate, which prints red ink, is made by sequentially exposing a separation film through green and blue filters. The second plate, which prints another non-process ink such as green, blue, or black ink, is made by sequentially exposing a separation film through red and blue filters. Claim 1 of the patent, which is the focus of this litigation, defines the invention as follows:

1. A method of printing on a sheet member a realistic reproduction of a colored original, utilizing a minimum of two different superimposed impressions, each with a different coloring medium, comprising:

(a) providing a colored original,

(b) creating a first printing plate intended to print a non-process red color, by

(1) making a green filter exposure of the original on a first means for recording a first optical image,

(2) making a blue filter exposure of the original on said first means,

*steps (1) and (2) being carried out sequentially* in any order,

(c) creating a second printing plate intended to print a second color different from that printed by said first plate, by

---

1. When a photographic process is used, the filters are of colors complementary to the process ink colors. Thus, three separations are made by separately photographing the original image through red, blue, and green filters; the separations are used to make printing plates that will print cyan, yellow, and magenta inks, respectively. A fourth separation, used to make a printing plate that will print black ink, is made either by photographing the original through a combination of red, blue, and green filters, or by photographing the original in black and white.

2. The '241 patent issued from application Serial No. 712,659, filed March 18, 1985, which was a continuation-in-part of Serial No. 595,815, filed April 2, 1984. The '815 application was itself a continuation-in-part of Serial No. 485,668, filed April 18, 1983.

3. For simplicity we will refer only to Mark I when discussing the '241 invention and the prosecution history of the '241 patent.

(3) making a red filter exposure of the original on a second means for recording a second optical image,

(4) making a blue filter exposure of the original on said second means,

*steps (3) and (4) being carried out sequentially* in any order,

steps (b) and (c) being carried out in any order,

(d) providing a sheet member to receive two superimposed impressions, and

(e) using said first and second printing plates to print said red color and said different color, respectively, as the said superimposed impressions on said sheet member [emphasis added].

The patent specification indicates that either photographic or scanning techniques may be used to carry out the invention:

Each film is exposed sequentially through the two filters or with the equivalent two lights on [a] conventional scanner.

. . . .

It is emphasized again that the interposition of actual colored filters between the original and a means for recording an optical image (such as a piece of film) is not the only way to create the appropriate printer. The presently available scanner machines accomplish the same effect by illuminating the original with light of a particular color. In the . . . claims, reference is made to "making a . . . filter exposure", etc., and it is to be understood that this wording is intended to embrace those techniques which do not actually require a physical filter to be interposed, but which achieve exactly the same effect as if the filter had been interposed.

Col. 3, ll. 42–44; col. 6, ll. 6–17.

Donnelley is in the business of producing Yellow Pages telephone directories. It prints color images for its directories using a commercially available Crosfield scanner and two non-process inks. The scanner focuses a single beam of white light on a small area (a "pixel") of the colored original. The light reflects back into the scanner where it is split into three separate light beams. The beams are then *simultaneously* filtered through red, green, and blue filters within the scanner. Next, the scanner senses the intensities of the beams and converts this information into digital values which are stored in memory. The scanner repeats this process for each pixel until the entire image has been scanned. To create separations, the scanner analyzes the stored data to determine the size and density of the various ink dots needed to replicate each pixel's color. It then converts the data into electrical impulses, sends the impulses to light sources (lasers or lamps), and pulses the light sources to expose tiny spots on separation films. Each spot of film is either exposed only once or is not exposed at all. The resulting separations are used to make printing plates, which in turn are used to print images in Donnelley's telephone directories.

Mark I sued Donnelley alleging infringement of the '241 patent.[4] Donnelley denied the allegation and moved for summary judgment of noninfringement, arguing that it did not literally infringe the patent because it did not use filters sequentially or make sequential exposures of film. In addition, Donnelley argued that its process was known and used before the '241 invention and therefore that the doctrine of equivalents was not applicable. *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684, 14 USPQ2d 1942, 1948 (Fed.Cir.1990) ("[S]ince prior art always limits what an inventor could have claimed [during prosecution], it limits the range of permissible equivalents of a claim."). Donnelley further argued that prosecution history estoppel precludes Mark I from establishing infringement under the doctrine of equivalents. In response, Mark I essentially conceded that Donnelley did not literally infringe the '241 patent, but argued that genuine issues of material fact precluded summary judgment in Donnelley's favor on Mark I's theory of infringement under the doctrine of equivalents.

---

**4.** The lawsuit was originally brought in the United States District Court for the Southern District of New York, but was transferred on Donnelley's motion to the United States District Court for the Northern District of Illinois.

The district court referred Donnelley's motion to a magistrate judge, who issued a Report and Recommendation on June 10, 1994. The magistrate judge determined that prosecution history estoppel precluded Mark I from proving infringement under the doctrine of equivalents and thus recommended that the court grant summary judgment of noninfringement. The district court, deciding the motion independently, granted summary judgment on a different ground. The court determined that Mark I did not refute Donnelley's factual assertion that the accused process was in the prior art and thus that it could not infringe the patent under the doctrine of equivalents. The court found that Mark I, through the affidavit of its expert, had only asserted that the '241 patent was not invalid, even though Donnelley never challenged the patent's validity. Thus, in the court's view Mark I failed to raise a genuine issue of material fact concerning Donnelley's theory of noninfringement. In granting summary judgment, the court found it unnecessary to determine whether prosecution history estoppel precluded Mark I from establishing infringement under the doctrine of equivalents. This appeal followed.

## DISCUSSION

■■■■ Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576–77, 12 USPQ2d 1382, 1383 (Fed.Cir.1989). Thus, summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant. *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed.Cir.1995). We review *de novo* a district court's grant of summary judgment. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994).

Mark I does not contest the court's determination that Donnelley did not literally infringe the '241 patent. Rather, Mark I asserts that the court erred in holding that Mark I did not refute Donnelley's assertion that the accused process cannot infringe the '241 patent because it is a prior art process. Mark I further argues that the question of prosecution history estoppel raises genuine issues of material fact precluding a grant of summary judgment. Donnelley responds that the court correctly granted summary judgment because Mark I did not dispute Donnelley's contention that it practices the prior art. Alternatively, Donnelley contends that prosecution history estoppel precludes application of the doctrine of equivalents in this case.

Having thoroughly reviewed the record, we have concluded that the district court's judgment should be affirmed on the ground of prosecution history estoppel. Although the district court did not reach this question, "[b]ecause this issue is purely legal and was fully briefed to the district court, in the interests of economy, this court will decide [the issue] on the merits...." *Dupont Merck Pharmaceutical Co. v. Bristol–Myers Squibb Co.*, 62 F.3d 1397, 1401 (Fed.Cir. 1995). To determine whether prosecution history estoppel precludes Mark I from establishing infringement under the doctrine of equivalents, we must review the prosecution history of the '241 patent.

### A. *Prosecution History of the '241 Patent*

Mark I filed the "grandparent" application to the '241 patent, Serial No. 485,668, on April 18, 1983. The '668 application broadly claimed a process of simulating colored originals by printing with two different colored inks. Claim 1 of the application required the formation of two separations, but, importantly, it did not require that either separation be made by sequentially interposing two different filters:

1. A method of printing on a sheet member a realistic image of an original utilizing two different superimposed impressions with two different inks, comprising:

making a first film and therefrom a first plate adapted to print a first ink having a first hue at all locations corresponding to a first colour predominating in the original,

making a second film and therefrom a second plate adapted to print a second ink having a second hue at locations such that the second ink in relation to the first ink seen against the sheet gives to the eye the impression of a third hue present in the original but not present in either the first or second inks,

coating the plates with their respective inks, and printing the sheet member with the plates.

In a first Office Action, the U.S. Patent and Trademark Office (PTO) rejected claim 1 under 35 U.S.C. § 102 as being anticipated by a *Dupont Magazine* article entitled "Multicolor Effects on Two–Color Presses." The article describes two-color printing on colored paper and, in particular, suggests the use of "two printing plates to blend red and blue ink on yellow paper." The PTO also rejected claims 1–5 under 35 U.S.C. § 103 as being obvious over the *Dupont Magazine* article in view of three secondary references. The Office Action was conclusory and did not discuss the cited references or articulate any reasons supporting the rejections.

Mark I, however, did not respond to the Office Action. Instead, it filed a continuation-in-part application. The claims originally filed in that application also required the use of two printing plates and, like the '668 application, did not require that either printing plate be made by sequentially interposing filters. Claim 1 of the '815 application read as follows:

1. A method of printing on a sheet member a realistic image of an original, utilizing two different superimposed impressions with two different colouring media, comprising:

creating a first printing plate by the interposition of at least two filters between

the original and means for recording a first optical image,

creating a second printing plate by the interposition of at least one filter between the original and means for recording a second optical image,

and using said first and second plates to print the said different impressions with two different colouring media.

On June 8, 1984, before receiving a first Office Action, Mark I amended claim 1 to require that the first, but not the second, printing plate be made by sequentially interposing two different colored filters. Specifically, claim 1 was amended to read as follows:

1. (amended) A method of printing on a sheet member a realistic image of an original, utilizing two different superimposed impressions with two different colouring media, comprising:

creating a first printing plate by the *sequential* interposition of at least two *different colour* filters between the original and means for recording a first optical image,

creating a second printing plate by the interposition of at least one filter between the original and means for recording a second optical image,

and using said first and second plates to print the said different impressions with two different colouring media.

Then, in July 1984, Mark I filed a Petition to Make Special pursuant to M.P.E.P. § 708.02.VIII.[5] In the petition, Mark I characterized the claimed invention as follows:

The applicant ... has discovered an alteration in the film-producing step typically employed in the four-colour separation process which alteration is such as to allow a stunningly realistic reproduction of an original in only two inks....

The alteration ... involves, in the case of the use of film, the double exposure of

5. Section 708.02.VIII of the *Manual of Patent Examining Procedure* ("M.P.E.P.") permits an accelerated examination of a patent application for which a pre-examination search of the prior art has been conducted. The applicant must, *inter alia*, submit copies of the most pertinent prior art references located by the search and provide "a detailed discussion of the references, which ... points out, with the particularity required by 37 CFR 1.111(b) and (c), how the claimed subject matter is distinguishable over the references." M.P.E.P. § 708.02.VIII (6th ed., Jan. 1995).

the film using two different filters *sequentially* [emphasis added].

In addition, quoting language from claim 1, Mark I distinguished the claimed process from several prior art references cited in its accompanying search report on the ground that the references did not suggest "the '*sequential interposition* of at least two different colour filters between the original and means for recording a first optical image [emphasis added].'"

Despite Mark I's attempt to distinguish the claimed invention from the prior art based on the claim limitation that the first separation be made by sequentially interposing two filters, the PTO, in a September 18, 1984 Office Action, rejected claims 1 and 4–10 of the '815 application under 35 U.S.C. § 103 as being obvious over *The Lithographers Manual*, Vol. I (Waltwin Pub.1958) in view of the *Dupont Magazine* article. *The Lithographers Manual* suggests making a printing plate using supplemental film exposures with different colored filters. The examiner took the position that it would have been obvious to apply the teachings of *The Lithographers Manual* to any conventional color processing technique, including the two-color process disclosed in the *Dupont Magazine* article. Dependent claims 2 and 3 were also rejected on similar grounds.

Mark I again did not respond to the Office Action, but instead filed a second continuation-in-part application. That application contained new claims which required, for the first time, that each of the two recited printing plates be formed using two filters, and that *both* printing plates be made by *sequentially* making two different filter exposures of the original color image on a film. The application was allowed without comment by the examiner and issued as the '241 patent.

### B. *Prosecution History Estoppel*

■ Prosecution history estoppel precludes a patentee from obtaining in an infringement suit patent protection for subject matter which it relinquished during prosecution in order to obtain allowance of the claims. *Zenith Lab., Inc. v. Bristol–Myers Squibb Co.,* 19 F.3d 1418, 1424, 30 USPQ2d 1285, 1290 (Fed.Cir.), *cert. denied,* — U.S.

——, 115 S.Ct. 500, 130 L.Ed.2d 409 (1994). It thus serves as a check on the applicability of the doctrine of equivalents. The standard for determining whether particular subject matter was relinquished is an objective one that depends on what a competitor reasonably would conclude from the patent's prosecution history. *Id.* The application of prosecution history estoppel is a question of law. *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 867 F.2d 1572, 1576, 9 USPQ2d 1995, 1998 (Fed.Cir.1989).

■ "The prosecution history must be examined as a whole in determining whether estoppel applies." *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 867, 26 USPQ2d 1767, 1775 (Fed.Cir.1993). Thus, the relevant prosecution history here includes not only the '659 application but also the parent '815 and grandparent '668 applications. *See Jonsson v. Stanley Works,* 903 F.2d 812, 818, 14 USPQ2d 1863, 1869 (Fed.Cir.1990) (prosecution history of parent application is relevant to understanding scope of claims issuing in a continuation-in-part application).

■ The prosecution history of the '241 patent indicates that the grandparent '668 application broadly claimed a process for reproducing color images by printing with two printing plates and two inks. The claims were rejected over prior art that suggested replicating a color image using two printing plates and two inks. Instead of responding to the rejection, Mark I filed the '815 continuation-in-part application with new claims. Mark I then narrowed the '815 claims to require that the first printing plate be made by *sequentially* interposing filters. Subsequently, in its Petition to Make Special, Mark I argued that the *sequential* interposition of filters distinguished the claimed invention from the prior art. The '815 application claims were then rejected over a combination of references which, in the PTO's view, suggested using supplemental film exposures in a two-color printing process. Rather than respond to the rejection, Mark I again chose to file a continuation-in-part application with new claims. The claims in the '659 application were even narrower than the '815 claims,

and required that *both* plates be made by *sequentially* interposing colored filters.

Donnelley argues that the prosecution history of the '241 patent shows that Mark I surrendered claim coverage for a process not involving sequential interposition of colored filters. We agree. The prosecution history demonstrates that Mark I was unsuccessful in obtaining allowance of the claims until they were narrowed to require that both the first and the second printing plates be made by sequentially interposing particular combinations of colored filters. Moreover, during prosecution Mark I asserted that the claims were patentably distinguishable over the prior art based on these process steps. Thus, in our view a competitor reviewing the prosecution history of the '241 patent reasonably would conclude that, in order to procure issuance of the patent, Mark I surrendered claim coverage to a process not involving sequential interposition of filters.

■ The fact that the claims of the '659 application were not themselves rejected by the Patent Office or amended by Mark I does not call for a different result. Mark I chose to file continuing applications with successively narrower claims in lieu of otherwise responding to the PTO's rejections, but an estoppel is not avoided by failing to respond to a rejection and instead meeting the substance of the rejection by filing a narrower continuing application. Rather, the prosecution history must be viewed as a whole to determine whether and what subject matter was surrendered to procure issuance of the patent. Viewed in its entirety, the prosecution history of the '241 patent clearly shows that Mark I surrendered claim coverage in order to obtain an allowance of the claims.

■ Mark I argues that, at a minimum, the question of prosecution history estoppel raises genuine issues of material fact precluding a grant of summary judgment. We disagree. The relevant facts here are undisputed; the prosecution history of the '241 patent is a matter of public record. Moreover, the meaning of the prosecution history is clear. A competitor reviewing the '241 patent's prosecution history would not have to go beyond the public record to reasonably conclude that Mark I had relinquished claim coverage for a process not involving sequentially interposing colored filters.

■ We therefore hold that Mark I is estopped from asserting infringement by any process that does not involve a sequential interposition of colored filters. The accused process indisputably does not involve the sequential interposition of filters; rather, three light beams are *simultaneously* filtered through red, green, and blue filters within the scanner. Thus, no reasonable fact-finder could find that the accused process infringes the '241 patent; summary judgment of noninfringement was therefore appropriate. *See Brenner v. United States,* 773 F.2d 306, 307, 227 USPQ 159, 160 (Fed.Cir.1985) (Summary judgment of noninfringement will be upheld on appeal when there is no literal infringement "and a prosecution history estoppel makes clear that no actual infringement under the doctrine of equivalents can be found.").

Because the prosecution history estoppel issue is dispositive, we need not decide whether the district court correctly ruled that Mark I failed to dispute Donnelley's contention that its process is prior art to the '241 patent.

## CONCLUSION

The district court's grant of summary judgment of noninfringement in favor of Donnelley is affirmed.

*AFFIRMED.*