Alexander S. ORENSHTEYN, Plaintiff,

v.

CITRIX SYSTEMS, INC., Defendant.

No. 02–60478–CIV.

United States District Court,
S.D. Florida,
Miami Division.

May 20, 2003.

Timothy W. Johnson, David Fink, Fink & Johnson, Houston, TX, William Frank Gallese, Port St. Lucie, FL, for plaintiff.

Michael Ross Tein, Shook, Hardy & Bacon, Miami, FL, Douglas J. Kline, John D.

Lanza, Christina N. Smith, Gary Grossman, Testa, Hurwitz & Thibeault, Amanda J. Metts, Testa, Hurwitz & Thibeault, Boston, MA, for defendant.

## ORDER GRANTING SUMMARY JUDGMENT

JORDAN, District Judge.

Alexander Orenshteyn sues Citrix Systems for patent infringement pursuant to 35 U.S.C. §§ 271 and 281. Citrix answered and interposed a counterclaim that Mr. Orenshteyn's patents were invalid. On March 6, 2003, Citrix filed a motion for summary judgment on the issues of non-infringement and invalidity. For the reasons set forth below, Citrix's motion for summary judgment [D.E. 123] is GRANTED.

## I. RELEVANT FACTS[1]

Citrix, founded in 1989, is the global leader in software technology that allows users to access applications and information, using a wide variety of devices, over a network. *See* Affidavit of Frank Pisciuneri, Citrix's Americas Controller, at ¶ 5. Citrix, headquartered in Fort Lauderdale, Florida, employs approximately 1,700 people in 22 countries worldwide. *See id.* at ¶ 3. It has earned widespread recognition for proven technology solutions and business achievements, and has been awarded over two dozen patents by the United States Patent and Trademark Office. *See id.* at ¶¶ 7, 9. Citrix solutions have been adopted by all of the Fortune 100 companies, 95% of the Fortune 500 companies in the United States, and over 75% of the *Financial Times FT* 500 in Europe. *See id.* at ¶ 8.

### A. THE PATENTS

On March 30, 1999, United States Patent Number 5,889,942 ("the '942 patent"), entitled "Secured System for Accessing Application Services from a Remote Station," issued to Mr. Orenshteyn. *See* Motion for Summary Judgment, Exh. D–1. On May 21, 2002, United States Patent Number 6,393,569 ("the '569 patent"), entitled "Secured System for Accessing Application Services from a Remote Station," issued to Mr. Orenshteyn. *See id.,* Exh. D–2.

Mr. Orenshteyn's patents generally concern "reciprocal client-server network system[s]," and are particularly related to a "method for obtaining application services ... from a server and for delivering such services to the requesting client/desktop device." *Id.,* Exh. D–1 at Col. 1, ln. 6–10. *See also id.,* Exh. D–2 at Col. 1, ln. 10–14 (same). Client-server network systems were known when Mr. Orenshteyn filed his first patent application. *See id.,* Exh. D–1, at Col. 2, ln. 60 through Col. 4, ln. 11. Prior client-server systems typically included at least one "client station," such as a general purpose PC, connected to a server computer, which could also be used as a general purpose PC. *See id.* at Col. 1, ln. 65–67 and Col. 2, ln. 40–42; Exh. D–2 at Col. 2, ln. 8–10 and 65–67. In these systems, the "client station" and the server computer were connected by a network, such as a local area network or a wide area network like the internet. *See id.,* Exh. D–1, Col. 2, ln. 34–38; Exh. D–2, Col. 2, ln. 58–64.

The purpose of the patents is described in the specifications as follows. "General purpose computing on the desktop, i.e., desktops having a standard OS (such as Windows 95®) and a microprocessor (such as the Pentium® chip), has to be replaced by a system which is less expensive to own and maintain but at the same time does

---

[1] These facts, where uncontroverted, are taken directly from Citrix's statement of material facts [D.E. 125]. Where a dispute exists, however, the facts are viewed in the light most favorable to Mr. Orenshteyn.

not short-change the user by taking away features we all have come to expect from our PCs ..." *Id.,* Exh. D–1, Col. 1, ln. 65 through Col. 2, ln. 3; Exh. D–2, Col. 2, ln. 8–14. The patent specifications also state that "expensive general purpose processing CPUs are preferably replaced with inexpensive but powerful controllers, such as DSP chips." *Id.,* Exh. D–1, Col. 6, ln. 17–20; Exh. D–2, Col. 7, ln. 5–7. The patents also contain a statement that "[i]t should be understood that general purpose computers will also work with the present invention (with little or no modifications), such that existing owners of PCs can access any specialized server to spawn a selected application, as desired." *Id.,* Exh. D–1, Col. 9, ln. 48–52; Exh. D–2, Col. 18, ln. 24–28.

The patent specification also states that the invention differs from prior client-server systems because it "enables selected, i.e., restricted, access from the application on the remote server to the client's permanent storage facilities, such as the hard drives, CD–ROM drives, tape drives, floppy drives, and any other I/O or other device which may be attached to the client." *Id.,* Exh. D–1, Col. 5, ln. 43–49; Exh. D–2, Col. 6, ln. 20–24. Thus, Mr. Orenshteyn claimed a system in which a remote server processes the client's data using an application that is executing on the server "without permanently storing the data within the server." *Id.,* Exh. D–1, Col. 4, ln. 57–61; Exh. D–2, Col. 29–37. "In other words, the client serves file systems, screen, keyboards, mouse, other attached devices to a server, while the server serves to the client application logic and compute-power." *Id.,* Exh. D–1, Col. 4, ln. 61–64; Exh. D–2, Col. 5, ln. 37–40.

**B. PROCEDURAL HISTORY, CITRIX'S EXPERT REPORTS, AND MR. ORENSHTEYN'S DISCOVERY RESPONSES**

On April 9, 2002, Mr. Orenshteyn commenced this lawsuit by alleging that Citrix "has for a long time past infringed and still is infringing, actively inducing the infringement of, and contributorily infringing at least claim 1" of the '942 patent. Complaint at ¶ 9 [D.E. 1]. On June 21, 2002, Mr. Orenshteyn amended his complaint to allege that Citrix also "has for a long time past infringed and still is infringing, actively inducing the infringement of, and contributorily infringing at least claim 1" of the '569 patent. Amended Complaint [D.E. 19] at ¶ 13.

On July 11, 2002, Citrix filed it answer denying Mr. Orenshteyn's allegations, and asserting various defenses, including that the '942 and '569 patents are invalid and "were known in the prior art." Answer at ¶¶ 16, 17, 21 [D.E. 27]. Citrix asserted counterclaims seeking declaratory judgments of non-infringement and invalidity. *See* Counterclaim at ¶¶ 13, 15 [D.E. 27].

On May 29, 2002, I entered a scheduling order setting a January 31, 2003, deadline for the completion of all discovery. *See* Scheduling Order at 1 [D.E. 13]. I amended that scheduling order, at the parties' request, on December 3, 2002, and extended the deadline for serving expert witness summaries and reports to December 20, 2002, and rebuttal expert reports to January 17, 2003. *See* Order [D.E. 69].

Citrix served the first expert report of Dr. Jose A.B. Fortes on December 20, 2002. The 173–page report describes Dr. Fortes' opinion that under Mr. Orenshteyn's presumed claim construction, all the claims of the '942 and '569 patents are invalid because they were fully anticipated by at least seven prior art references. *See* Motion for Summary Judgment, Exh. C–1 at ¶¶ 311–566. It contains a detailed claim construction for both the '942 and '569 patents, and, in two exhibits, provides Dr. Fortes' qualifications and all the materials he reviewed in formulating his opinion.

*See id.* at ¶¶ 41–307, Exh. A, B. Mr. Orenshteyn declined to depose Dr. Fortes.

Dr. Fortes, in his first expert report, identifies several commercially available systems predating Mr. Orenshteyn's patent filings that describe the alleged inventions. *See id.,* Exh. C–1 at ¶¶ 27–38. The prior art that allegedly invalidates the patents are

1. Sandberg's paper for the second version of the NFS protocol, published in 1985. *See id.,* Exh. D–19 at 91. *See also id.,* Exh. C–1 at ¶ 357.

2. Triton Technologies, Inc.'s manual for its CoSession product, published in 1993. *See id.,* Exh. D–20 at 2. *See also id.,* Exh. C–1 at ¶¶ 314, 316, 318–19, 322, 324–25.

3. Symantec Corporation's manual for version 2 of its pcAnywhere for Windows product, published in 1993 or 1994. *See id.,* Exh. D–21. *See also id.,* Exh. C–1 at ¶¶ 314, 316, 318–19, 322, 324–25; Exh. E.

4. Citrix's manual for version 2.3 of its WinView product, published in 1994. *See id.,* Exh. D–22. *See also id.,* Exh. C–1 at ¶¶ 314, 316, 318, 322, 324; Exh. E.

5. Stac, Inc.'s manual for version 5.0 of its ReachOut product, published in 1995. *See id.,* Exh. D–23. *See also id.,* Exh. C–1 at ¶¶ 314, 316, 318–19, 322, 324–25; Exh. E.

6. Sun Microsystems, Inc.'s manual for version 2.1 of its Wabi product, published in 1995. *See id.,* Exh. D–24. *See also id.,* Exh. C–1 at ¶¶ 314, 316, 320, 326.

7. Microcom Systems, Inc.'s manual for version 3 of its Carbon Copy product, published in 1995. *See id.,* Exh. D–25; *See also id.,* Exh. E.

On January 17, 2003, Citrix served the second expert report of Dr. Fortes, which discloses his opinion that Citrix's MetaFrame products (the only Citrix products named in Mr. Orenshteyn's amended complaint) do not infringe claim 1 of the '942 patent or claim 1 of the '569 patent, as those claims would be interpreted by one of ordinary skill in the art, either literally or under the doctrine of equivalents. *See id.,* Exh. C–2 at ¶ 22. Mr. Orenshteyn failed to serve any expert report, rebuttal or otherwise. *See* Lanza Affidavit at ¶¶ 6–7.

In his second report, Dr. Fortes explains that claim 1 of each of the asserted patents describes a "controller," such as a digital signal processor, which is a less expensive replacement for a central processing unit. *See* Motion for Summary Judgment, Exh. C–2 at ¶¶ 17–19. *See also id.,* Exh. D–1, Col. 6, ln. 17–20; Exh. D–2, Col. 7, ln. 5–7. Dr. Fortes goes on to state that, because the MetaFrame products run on a computer having a CPU, which is substantially different from the claimed controller, they cannot infringe the asserted claims. *See id.,* Exh. C–2 at ¶ 20.

In a January 20, 2003, e-mail, Citrix repeated its invitation to make Dr. Fortes available for a deposition, and warned counsel for Mr. Orenshteyn to "please bear in mind that the Court-ordered discovery deadline is rapidly approaching." That same day, counsel for Mr. Orenshteyn responded by e-mail, declining Citrix's invitation to depose Dr. Fortes. In a January 23, 2003, letter, Citrix noted that "[y]our decision to forego deposing those gentlemen strikes me as a high-risk strategy. Nevertheless, it is your decision to make." On January 26, 2003, Citrix again invited counsel for Mr. Orenshteyn to depose Dr. Fortes. Mr. Orenshteyn's counsel did not respond.

On June 13, 2002, in his initial discovery disclosures, Mr. Orenshteyn represented that he is the only person presently known

likely to have discoverable information to support his claims. *See id.*, Exh. D–7. During his December 4, 2002, deposition, however, Mr. Orenshteyn testified that he did not "know anything about Citrix['s] products" and that he had no knowledge about how any Citrix product infringed his patents. *See* Deposition of Alexander Orenshteyn at 80, 90. According to his testimony, after contacting more than two dozen attorneys in an attempt to find someone who would bring an action for infringement of his patents, Mr. Orenshteyn retained the law firm of Fink & Johnson, his current counsel, who sued Citrix without explicitly consulting Mr. Orenshteyn about filing the lawsuit. *See id.* at 65, 72. Mr. Orenshteyn went on to testify that he did not consult with his attorneys about Citrix prior to filing suit, and he did not know whether Fink & Johnson conducted any pre-filing factual investigation. *See id.* at 89. Mr. Orenshteyn relied "100 percent" on Fink & Johnson in bringing suit against Citrix. *See id.* at 88. He also testified that he never discussed with his attorneys whether any Citrix product infringes any claim of his patents, and that he is not even curious how his attorneys came to that conclusion. *See id.* at 72, 144. Mr. Orenshteyn, in fact, could not even name a single Citrix product. *See id.* at 59.

On October 8, 2002, Citrix served interrogatories seeking, among other things, the factual basis for Mr. Orenshteyn's infringement claims and a description of how he construes his claims. *See* Motion for Summary Judgment, Exh. D–9. Mr. Orenshteyn responded on November 12, 2002, but asserted attorney-client and work product privileges as grounds for refusing to identify which patent claims he asserts against which Citrix products, what he believes those claims to mean, and why he believes those claims cover Citrix's products. *See id.*, Exh. D–10.

Mr. Orenshteyn responded to Citrix's requests for admission on January 30, 2003, and admitted that, prior to filing his complaint, he had no opinion, and had conducted no investigation about whether any product made or sold by Citrix infringed the '942 or '569 patents. *See id.*, Exh. D–12; Exh. D–13, no. 33–40. Mr. Orenshteyn, however, refused to answer 58 of the requests for admission concerning, among other things, whether his counsel conducted any pre-filing factual investigation to determine whether his infringement claims have any evidentiary support, on the ground of attorney-client and work product privilege. *See id.*, Exh. D–13, no. 73–110, 113–14, 117–18, 121–22, 125–26, 129–30, 133–34, 137–38, 141–42, 145–46, 149–50.

On December 10, 2002, Citrix issued two subpoenas to Fink & Johnson seeking documents and commanding a representative to appear for a deposition. *See id.*, Exh. D–14. Fink & Johnson responded with a motion for a protective order which was denied by Magistrate Judge Brown on February 11, 2003. *See* Order Re Motion for Protective Order [D.E. 106]. In light of certain representations made by Fink & Johnson in its motion for reconsideration, Magistrate Judge Brown suspended his prior ruling and ordered Mr. Orenshteyn to serve, within five days, supplemental answers to Citrix's interrogatories "to provide the information that Citrix asserts Orenshteyn refuses to provide" under the threat of sanctions. *See* Order Re: Motion for Reconsideration at 2–3 [D.E. 113].

On February 26, 2003, Mr. Orenshteyn filed his supplemental interrogatory responses as ordered by Magistrate Judge Brown. *See* Motion for Summary Judgment, Exh. D–17. These responses identified certain claims that Mr. Orenshteyn contends Citrix has infringed, offered Mr. Orenshteyn's claim construction for certain of his claim terms (but did not explain the

basis for those constructions), and included claim charts which are devoid of any evidentiary citations. *See id.* at 2–21, 23–37.

### C. MR. ORENSHTEYN'S ADMISSION IN THE *IBM* LAWSUIT

In another lawsuit filed by Mr. Orenshteyn pending in the Southern .District of New York, *see Alexander S. Orenshteyn v. International Business Machines Corp.,* No. 1:02–CV–5074, Mr. Orenshteyn *admitted* (in his answer to IBM's counterclaim) that the '942 and '569 patents are, in fact, invalid. *See* Motion for Summary Judgment, Exh. D–26 at ¶ 32; Exh. D–27 at ¶ 8. Mr. Orenshteyn filed his answer with this admission on October 28, 2002. Although Mr. Orenshteyn's counsel—who also represent him in the New York action—refer to the admission as a scrivener's error, they have yet to move to amend the answer or correct the alleged mistake.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Elecs. North Am., Inc.,* 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to Mr. Orenshteyn, the non-moving party, there is evidence on which the trier of fact could reasonably find a verdict in his favor. *See Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn,* 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997).

### III. ANALYSIS

Citrix contends that it is entitled to summary judgment on the issues of non-infringement and invalidity because the undisputed evidence indicates that none of the alleged products infringes on the claims of either the '942 or '569 patents, and that those patents were fully anticipated by at least five prior arts. I agree.

### A. CITRIX'S PRODUCTS DO NOT INFRINGE ON MR. ORENSHTEYN'S PATENTS

 An infringement analysis entails a two step process. First, I must determine the meaning and scope of the patent claims asserted to be infringed. Second, the construed claims must be compared to the device accused of infringing. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817, 825 (Fed.Cir.1999). Mr. Orenshteyn bears the burden of proving infringement by a preponderance of the evidence, and must show that every limitation set forth in his patent claim is present in the accused Citrix products. *See Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir. 1991). Mr. Orenshteyn has utterly failed to meet that burden.

#### 1. CLAIM CONSTRUCTION

Citrix argues that the term "controller," contained in each of the independent patent claims that Mr. Orenshteyn says are infringed by Citrix products, refers to a replacement for a general purpose CPU. Because each of Citrix's accused products uses a general purpose CPU, it contends

that the products do not infringe as a matter of law.

When construing a patent claim, three sources should be considered: (1) the language of the claims themselves; (2) the patents specification; and (3) the prosecution history. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995). A court may also consider extrinsic evidence, such as expert testimony as to how those skilled in the art would interpret the claims. *See id.* A court, however, is not required to rely on expert testimony if the intrinsic evidence establishes the proper construction of the claims. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 1996) ("It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record ... Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."). Additionally, a patentee is his own lexicographer, and the specification may act as a dictionary, defining terms used in the claim. *See id.* If the patentee does not offer a unique definition of his own, a court may refer to a dictionary to determine the proper definition of the claim. *See, e.g., National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,* 166 F.3d 1190, 1195 (Fed.Cir.1999) (referring to the dictionary definition of "select"); *Hazani v. U.S.I.T.C.,* 126 F.3d 1473, 1480 (Fed.Cir. 1997) (referring to the dictionary definitions of "integral" and "in"). Finally, claim construction is a question of law for the court, and is therefore amenable to resolution on summary judgment. *See Johnston v. IVAC Corp.,* 885 F.2d 1574, 1579–80 (Fed.Cir.1989).

Where a patentee has clearly defined a claim term, that definition is usually dispositive. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d 1352, 1360 (Fed.Cir.2002). In this case, Mr. Orensh-

teyn, in the patent specifications, has defined the term "controller" to mean something other than a general purpose CPU.

The patent specifications indicate that the term "controller," contained in each of the independent claims of the '942 and '569 patents, refers to a less expensive replacement for a general purpose CPU. For instance, the specifications state that "expensive general purpose processing CPUs are preferably replaced with inexpensive but powerful controllers, such as DSP chips." They also go on to define the purpose of the inventions as follows: "General purpose computing on the desktop, i.e., desktops having a standard OS (such as Windows 95®) and a microprocessor (such as the Pentium® chip), has to be replaced by a system which is less expensive to own and maintain but at the same time does not short-change the user by taking away features we all have come to expect from our PCs ..." These statements in the specifications indicate that the term "controller" means something other than a general purpose CPU.

Additionally, the specifications go on to describe two embodiments of the invention, the claimed one that features a "controller," and an unclaimed one that does not. In describing the unclaimed invention, the specification states that a general purpose CPU can be used. "It should be understood that general purpose computers will also work with the present invention (with little or no modifications), such that existing owners of PCs can access any specialized server to spawn a selected application, as desired." When describing the claimed invention that features a controller, however, the specification makes clear that "controller" does not mean a general purpose CPU:

> *Instead of a conventional general purpose CPU, inexpensive but powerful controller circuits will be utilized for*

*controlling storage devices and other I/O hardware. An example of a controller is a TI TMS320C4x or C3x DSP chip.* The controller or a plurality of controllers will control the client file system (file I/O logic) and low-level graphical interface logic (e.g. GUI). For example, each client may have a separate controller chip for the file system/disk controller block, the communication block and the display/human interface block of the client, or one *DSP control* may control all three blocks.

Motion for Summary Judgment, Exh. D–1, Col. 9, ln. 30–40 (emphasis added). Accordingly, the specification indicates that the term "controller" means something other than a general purpose CPU.

To the extent additional discussion is necessary, this definition and construction of the term "controller" in the patents also comports with the testimony of Dr. Fortes, who provided his opinion of how one of ordinary skill in the art would construe the language. Dr. Fortes' opinion was based on the patent specifications, engineering treatises, and dictionaries. He opined that the term "controller" refers to a replacement *for a general purpose CPU.* Additionally, although the testimony of an inventor should be given little weight in a court's claim construction, *see Markman,* 52 F.3d at 985, Mr. Orenshteyn clearly testified that the term "controller," as used in his patents, means a hardware device, and not a general purpose CPU:

Q. What's a controller?

A. A processing element.

Q. What's an example?

A. A processor, a chip, an integrated circuit.

Orenshteyn Deposition at 126–27.

Mr. Orenshteyn's opposition to the motion for summary judgment responds to Citrix's argument that the term "controller" means something other than a general purpose CPU in one sentence: "Indeed, Citrix's construction of the term is in direct contradiction to the patent specification." Opposition at 11. Mr. Orenshteyn, however, neither identifies any contradiction or cites to any part of the specifications which allegedly contradict Citrix's construction. Mr. Orenshteyn, therefore, has offered no viable alternative to the claim construction asserted by Citrix. Citrix's construction of the term "controller" comports with the patent specifications, and is, moreover, supported by expert testimony. Accordingly, the term "controller," contained in each of the independent claims of the '942 and '569 patents is construed as a matter of law to mean something other than a general purpose CPU.

### 2. COMPARISON TO CITRIX'S PRODUCTS

■ As stated above, Mr. Orenshteyn bears the burden of proving that the accused Citrix products infringe on each and every claim of his patents in order to show infringement. In his second report, Dr. Fortes opines that none of the accused Citrix products infringe—either literally or under the doctrine of equivalents—on any of the claims of Mr. Orenshteyn's patents. His basis for this opinion is that Citrix's products execute on computers that use general purpose CPUs to execute application program code instead of "controllers," as that term is used in Mr. Orenshteyn's patents. *See* Motion for Summary Judgment, Exh. C–2 at ¶¶ 20–21.

Although Mr. Orenshteyn bears the burden of showing that each and every claim of his patents are infringed by Citrix's products, he has submitted evidence that only *one* of the accused products infringes on only *one* claim of his '942 patent. The record is devoid of evidence relating to any of the 29 other claims Mr. Orenshteyn asserts are infringed. For instance, Mr. Orenshteyn does not cite to any evidence that he contends shows that the accused

MetaFrame 1.1 for Unix or MetaFrame for Windows XP products infringe on his patents. He also fails to cite any evidence that the MetaFrame 1.8 product infringes on any of his patent claims other than claim 1 of the '942 patent. Accordingly, as Mr. Orenshteyn bears the burden, his claim for infringement on these other 29 claims fails as a matter of law.

The evidence relied upon by Mr. Orenshteyn to show infringement of claim one of his '942 patent is wholly insufficient. The evidence consists solely of a "claim chart," which contains citations to the deposition of Brad Pedersen, Citrix's Chief Software Architect, and the Administrators Guide to Citrix's MetaFrame for Windows 1.8 product. The cited portions of the deposition and guide, however, in no way indicate that Citrix's product features a "controller," as required by each of his patent claims. Mr. Orenshteyn simply offers a conclusory statement that the guide and Mr. Pedersen's deposition "show that each and every element of the asserted patent claims are found in the accused Citrix products." Opposition at 7. This type of conclusory statement is insufficient to create an issue of fact. *See Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed.Cir.2000).

It is undisputed, given Dr. Fortes' reports, that the accused Citrix products all use a general purpose CPU to execute application program code. In contrast, the '942 and '569 patents use a "controller," which has been construed as something other than a general purpose CPU. In light of the unrebutted testimony of Dr. Fortes,[2] and the utter lack of evidence presented to the contrary, I find that Mr. Orenshteyn has failed to meet his burden of showing that any of the accused Citrix products infringe on his patents.

### B. INVALIDITY

Citrix argues that Mr. Orenshteyn's patents are invalid because (1) he has admitted that they are invalid, and (2) even if they are construed as broadly as he describes in his supplemental answers to Citrix's interrogatories, they are fully anticipated by prior art. Although these arguments appear to be meritorious, I decline to address them because I have agreed with Citrix's claim construction and found that its products do not infringe on Mr. Orenshteyn's patents.

### IV. CONCLUSION

For the reasons stated above, Citrix's motion for summary judgment [D.E. 123] is GRANTED.

A final judgment will issue by separate order.

---

**2.** Mr. Orenshteyn's only response to Dr. Fortes' testimony is that the expert reports "will be the subject of a separate motions (sic) in limine to exclude to be filed shortly." Opposition at 8. The contention that Mr. Orenshteyn will, at some indeterminate point in the future, file a motion in limine, does not create an issue of fact or in any way rebut Dr. Fortes' testimony. *See Cochran v. CSX Transp., Inc.*, 112 F.Supp.2d 733, 741 (N.D.Ind.2000) ("The mere assertion that a motion in limine may be filed at some future time is not adequate to remove documentary evidence from consideration in opposition to a summary judgment motion."). Indeed, Mr. Orenshteyn has still not filed his threatened motion in limine even though he has been in possession of Dr. Fortes' first report for nearly five months, and the second report for nearly four months. This is despite the fact that he has since filed two motions in limine on unrelated issues [D.E. 165, 166].